#### ALAN JAMES DEVELOPMENT COMPANY *v.* VILLAGE OF MICHIANA.

1. CONTRACTS—POSSIBILITY OF PERFORMANCE.

The general rule that impossibility of performance is not an excuse for nonperformance of a contract does not apply, where the promise is to perform only if performance is possible.

2. SAME—WATER SUPPLY—POSSIBILITY OF PERFORMANCE.

Evidence presented in action by owners of subdivision in township territory adjoining defendant village *held,* insufficient to establish a contract between plaintiff and defendant relative to supplying water to owners of lots other than those receiving water at time suit was commenced, where trial court had found the then existing system was without capacity to furnish water to additional users at time the alleged agreement had been made.

Appeal from Berrien; Zick (Karl F.), J. Submitted November 6, 1963. (Calendar No. 54, Docket No. 49,624.) Decided February 3, 1964.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 12 Am Jur, Contracts § 365.

Bill by Alan James Development Corporation, a foreign corporation, against the Village of Michiana, a municipal corporation, for mandatory injunction compelling it to furnish water to plaintiff's subdivision properties, and for other relief. Partial relief granted, with count as to utility services dismissed. Plaintiff appeals. Affirmed.

*Gore & Williams (Charles W. Gore* and *Marcellus B. Meyer,* of counsel), for plaintiff.

*A. G. Preston, Jr.,* for defendant.

KELLY, J. Defendant, village of Michiana, a home-rule village incorporated in 1946, is bounded on the south by the village of Michiana Shores, Indiana, and on the north by New Buffalo township, Michigan.

Michigan Shores Country Club subdivision, a platted subdivision, became the property of plaintiff, an Indiana corporation engaged in the promotion and development of real estate, by virtue of an August 11, 1959, deed from S. L. Kahn and his wife, who, prior thereto, had acquired the property June 1, 1959, from the estate of Martin Wells, deceased.

Plaintiff, the owner of 151 lots in Michigan Shores Country Club subdivision, on June 15, 1960, filed its "bill of complaint for an injunction" alleging in count 1 that defendant violated its contract to "supply the premises of plaintiff with water," and in count 2 requested that defendant be enjoined from barricading and closing certain streets necessary for entrance to Michigan Shores Country Club subdivision.

The court granted plaintiff the relief requested in count 2 and defendant did not appeal; therefore, this appeal concerns only the court's refusal to grant plaintiff's prayer of relief "that a mandatory injunction issue against the defendant village compelling it

to furnish water to plaintiff's premises herein described."

About 20 lots in plaintiff's subdivision were receiving water at the time of trial and, recognizing that fact, the court's decree provided:

"That those persons who were connected to and using the water system operated by the Long Beach Company on June 15, 1960, are hereby authorized and permitted to remain connected to and receive water from that system."

Appellant presents 9 questions in its "Statement of questions involved," but concedes that:

"The essential legal questions posed by the pleadings and proofs are as follows:

"1. Was there a contract between Sylvia Wells and the village of Michiana?

"2. Did the defendant village agree, both in writing and by its subsequent conduct, to furnish water to the capacity of the Wells system, or the combined systems, to the subsequent purchasers of lots in plaintiff's subdivision?"

The Long Beach Company is a real-estate development company that originally acquired title to part of what is now the village of Michiana Shores, Indiana, and most of the village of Michiana, Michigan, for the purpose of subdividing the land, selling lots, building and selling homes, and, in order to sell the lots, it constructed a water system many years ago that was known as the "Mathias system."

About the same time the Mathias system was installed, Martin Wells acquired title to land in New Buffalo township which included the 151 lots in Michigan Shores Country Club subdivision now in issue, and he built a water system known as the "Wells system."

The 20 homes in the Michigan Shores Country Club subdivision receiving water at the time of trial

and referred to in the decree ordering said service to continue in the future, were connected to an integrated water system operated by the Long Beach Company which serves the village of Michiana Shores, LaPorte county, Indiana (approximately 400 connections), and the village of Michiana, Michigan (approximately 450 connections). Mr. Mathias is president of the Long Beach Company.

Martin Wells died in May, 1949, at which time there were 6 homes in the Michigan Shores Country Club subdivision. Mrs. Wells continued to operate the subdivision after her husband's death and between 1949 and 1951 she began negotiations for the sale of the Wells system, and refused an offer of $1,000.

In 1951, a "terrific storm" completely destroyed the pumping station of the Wells system and completely exposed the distribution system in the subdivision. The Long Beach Company "agreed to furnish them water temporarily through their system that was operating and supplying water to the balance of the village and the village of Michiana Shores, Indiana." The Long Beach Company estimated it would cost $10,000 to put the Wells system into repair.

The record sustains the trial court's finding in regard to events occurring between the 1951 storm and appellant's purchase of the property in 1959, as follows:

"Mr. Mathias (president of Long Beach Company) then suggested that if the village of Michiana would acquire what was left of the Wells system and would guarantee the cost of building a new pumping station at a new location, building a new intake, completely rebuilding the pumps and replacing the damaged mains, the Long Beach Company would do the work. This offer was accepted and the work done in the spring of 1952 even before negotiations had

been concluded with the Wells estate for transfer of the Wells system because of the emergency nature of the situation. The cost of the work, $4,800 for the mains and $5,800 for other improvements, was recovered by the Long Beach Company by the addition of a one-time charge of approximately $10 to all users of the integrated system both in Indiana and Michigan.

"What remained of the old Wells system, a pump, tank, and some mains, a system that was not in operating condition, was transferred by the Wells estate, by a corporate trustee, and by Sylvia Wells, individually, to the defendant village of Michiana by deeds dated March 24, 1952, for a nominal consideration of $1. The Wells system became a part of the Mathias system and became a single integrated system which might be called the Long Beach system as it is operated by that company. With the exception of certain of its mains, the Wells system completely lost its identity.

"Although the integration and rebuilding solved the emergency for the persons who had been connected to the old Wells system, it did not solve the larger problem of who was to furnish water to future users, not only in the area formerly served by the Wells system, but also in the large area, formerly served by the Mathias system, that is, the village of Michiana Shores, Indiana, and the village of Michiana, Michigan. Even before the merger of the Wells system with the Mathias system, the Long Beach Company was hard put to furnish water to its own customers. There were pressure problems, the mains were old and too small. Sprinkling was regulated in certain areas. There were problems of purity and sanitation. It was common knowledge that the Mathias system needed extensive repairs, additions and improvements. The area is hilly and certain portions suffer more than others from lack of pressure. In this the users in the old Wells area are more fortunate than their neighbors in the village of Michiana, Michigan. Conditions are steadily wor-

sening.  In 1954, Mr. Mathias offered to sell that part of the Long Beach system owned by the Long Beach Company to defendant village of Michiana for $27,000 but no agreement could be reached largely because of 'jurisdictional problems,' a large part of the system being in the State of Indiana.

"In 1949, the Mathias system broke down.  In the judgment of the village of Michiana, the Long Beach system is now inadequate and incapable of serving additional users in Michigan Shores Country Club subdivision and in 'Outlot A.'  It was for this reason that plaintiff's request for a tap or connection for lot 6, block B, Michigan Shores Country Club subdivision made August 24, 1959, was denied both by the defendant village of Michiana and by Mr. Mathias."

Appellant contends that a letter sent by Mrs. Wells' attorney, Ernest F. Staub, to the Michigan Shores Property Owners' Association, and a letter sent by defendant village's attorney (A. G. Preston, Jr.) to the Michigan Shores Property Owners' Association before Mrs. Wells conveyed her interest in the Wells system to defendant village, constituted an offer and an acceptance and, therefore, provides an affirmative answer to appellant's legal question 1, namely: "Was there a contract between Sylvia Wells and the village of Michiana?"

Mr. Staub's letter (March 24, 1952) to the Michigan Shores Property Owners' Association advised the Association that Mrs. Wells would, by quitclaim deed, convey her interest in the water system, provided:

"1. That you assume and pay her liability to G. A. Kowalsky for services rendered and material furnished in the amount of $386.03; and that you also assume and pay her liability to the Long Beach Company in the amount of $625 for water furnished by that company to residents of the Wells subdivision.

"2. That the village of Michiana—which I understand will ultimately acquire and operate the system —will agree to furnish water to the Hayes Inn, so that Mrs. Wells will not be in default under her lease with Mr. Hayes, which obligates her to see that water is supplied to the Inn for the duration of the lease. The charge for water supplied to the Inn shall not exceed $150 per season.

"3. That to the extent the capacity of the system permits, the village will agree to furnish water to subsequent purchasers of lots within the 2 subdivisions, it being understood that the expense of connecting with the existing water mains will be borne by the purchasers and not by the village."

Mr. Preston's letter (April 25, 1952) to the Michigan Shores Property Owners' Association acknowledged that he had received a letter from the Association enclosing Mr. Staub's letter of March 24, 1952, and, after Mr. Preston outlined what legal instruments would be necessary to effectuate a conveyance by Mrs. Wells and suggesting that same be sent to him, referred to Mr. Staub's 3 conditions to be fulfilled prior to closing, by stating:

"1. Payment of Mrs. Wells liability to G. A. Kowalsky in the amount of $386.03 and her liability to the Long Beach Company in the amount of $625. It is our understanding that the Association will take care of this matter.

"2. That the village agree to furnish water to the Hayes Inn for the duration of its lease with Mrs. Wells at a charge not to exceed $150 per season. Assuming this is agreeable to the village, we suggest that an agreement to this effect be made between Mrs. Wells and the village.

"3. The village is to furnish water to subsequent purchasers to the extent of the capacity of the system at the expense of such purchasers. The village will undoubtedly agree to this request, which can also be covered by agreement."

Mr. Staub (attorney for Mrs. Wells) testified that shortly after the storm had damaged her water system, she consulted with him informing him that the residents were insisting that she do something about it to improve the situation; that at her suggestion he first conferred with Mr. Mathias, who was the owner of the Long Beach Company, in an endeavor to make some arrangement to hook up with his company, but to no avail; that he had several meetings with representatives of the Michigan Shores Property Owners' Association which finally culminated in writing the letter to it, referred to above; that up until the time the matter came up in court he was under the impression there was a written agreement pertaining to the sale of the Wells system but that he could not find any such written agreement.

Mrs. Wells testified she had had no contact with Mr. Glass (village council president in 1952), or any other official of defendant village, and relied upon her attorney, Mr. Staub, and thought he was arranging matters so that water would be furnished to all of the lots in the subdivision. She testified that she did not see or sign any agreement between herself and the village, and only signed exhibit 4, being the deed transferring all of her rights to the water distribution system.

Maurice F. Glass, who lives in the village of Michiana, but whose business office is in Chicago, and who has been on the defendant village council "practically the entire time since we have been incorporated," testified that he only remembers Mr. Kahn when he (Kahn) contacted the council in regard to the closing of the roads; that at the time Mrs. Wells conveyed the property there were 6 or 7 houses in the subdivision and no more homes were built in that subdivision until Kahn and plaintiff corporation acquired the property in 1959; that to his knowledge none of the council members were

members of the Michigan Shores Property Owners' Association, and that he found out, for the first time, when he appeared in court that Preston had sent the letter to the Association (exhibit 5); that the village never took over the operation of the water system; that he was a councilman and was present at the March 15, 1952, meeting of the council when a vote was taken unanimously approving the council's purchase of the Wells system for $1 "subject to the improvement of the distribution system to provide adequate water to the residents of Michigan Shores and the existing residents of the Country Club Addition"; that he never received a "proposition from Mr. Staub of any kind," but "talked to him about when are we going to get the deed. We obligated ourselves for $10,000 and it would be repaired"; that the village did not have a contract with Mrs. Wells.

William Misch, who lives in Michiana, is a Stanford University graduate engineer, plant manager of a company in Michigan City, and councilman of defendant village since 1950, testified that the Michigan Shores Country Club subdivision is not within the village; that previous to the 1951 storm the Long Beach system furnished water to both the village and the Wells system; that both systems were inadequate, "pressures were low; the quality of water was not good. We have evidence there from the State which would tie into this"; that "the storm, which was in the fall of 1951, rendered the Wells system as a separate entity completely inoperative"; that the first he knew of Preston's letter to the Michigan Shores Property Owners' Association was after this hearing had started in court; that the present water system servicing the village is not able to supply the additional 100 lots sold by Kahn, or his company, except "at the expense of the present users who already have an inadequate supply."

The court commented upon the period following the execution of Mrs. Wells' deed to defendant village and the purchase of the property by Mr. Kahn, as follows: "No one seems to have given any serious thought to future users until Mr. Kahn made his purchase in 1959, some 7 years later."

Mr. Kahn, president and active manager of plaintiff corporation, confirms this fact by stating that at the time he purchased the property it was "in a rather dormant state," and further admits that he made the purchase knowing that the Long Beach Company serviced the water to the property he bought and he emphasized this fact by stating that at the time of purchase he had discussions with the Long Beach Company but did not have any discussions or contact in regard to supplying water with any official of defendant village.

The record does not disclose any connection or authorization between defendant village and the Michigan Shores Property Owners' Association. The acts or statements of the Association could not be binding upon defendant, and the trial court expressed doubt as to whether he should have allowed such evidence to be introduced.

Attorney Staub's letter to the Association cannot be construed as an offer, as it merely stated that Mrs. Wells was "ready and willing to quitclaim her interest in the system upon the following terms and conditions."

Nothing in the record discloses that defendant village council authorized Mr. Preston to accept any offer and his letter addressed to the Association, and not to Mrs. Wells, was merely directive in character, as disclosed by the statement: "We feel that the following things should be done to complete the transfer."

In concluding that no contract had been established between plaintiff and defendant, the court in

his written opinion stated that the evidence at most was proof of preliminary negotiations that were never consummated and future agreements that were never made; that any reservations Mrs. Wells may have had were never imparted to or accepted by defendant village; that nowhere in the minutes of the council meetings is there disclosed any intention of the council to "provide water to future users" and "there is no reference to any agreement either written or oral."

Referring to the necessity of proof of authorization or ratification by the village, the court stated:

"It is fundamental that there must be authorization for a municipal contract either by appropriate ordinance or resolution or by ratification in the form of a written instrument or acts indicating an intention to be bound. * * *

"At the meeting of March 15, 1952, the village authorized the purchase of the Wells system for $1 and nothing more. Thus, while the transfer of the system was expressly authorized at this meeting which, incidentally, was held the same day that the deed was dated, there was no mention by ordinance, resolution or otherwise of any agreement to furnish water to future users by the village or anyone else, no agreement of any kind and no ratification of any such agreement."

The court also held that the alleged contract, if any, was unenforceable because it contains no time limit. The court further held the alleged contract unenforceable by reason of impossibility and that the "impossibility was known to both parties or should have been known by both parties at the time the alleged agreement was made"; and

"Moreover, if there was a contract it was expressly conditioned upon the adequacy of the system to serve future users. The testimony of Mr. Glass and Mr. Misch makes it clear that the system has no capacity

to furnish additional users at the present time. The general rule that impossibility is not an excuse for nonperformance does not apply where the promise is to perform only if performance is possible. 12 Am Jur, Contracts, § 365, p 933."

Plaintiff failed to prove a contract between plaintiff and defendant, and the record sustains the trial court's decree:

"That count 1 of plaintiff's bill of complaint is hereby dismissed.

"That those persons who were connected to and using the water system operated by the Long Beach Company on June 15, 1960, are hereby authorized and permitted to remain connected to and receive water from that system."

Affirmed. Costs to appellee.

KAVANAGH, C. J., and DETHMERS, BLACK, SOURIS, SMITH, and O'HARA, JJ., concurred.

ADAMS, J., took no part in the decision of this case.